Stuart C. Gillespie (CO Bar No. 42861)
     *(pro hac vice pending)*
Caitlin Miller (CO Bar No. 50600)
     *(pro hac vice pending)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
sgillespie@earthjustice.org
Phone: (303) 996-9616
Fax: (303) 623-8083

*Attorneys for Plaintiffs Lower San Pedro
Watershed Alliance; Center for Biological
Diversity; Sierra Club; Maricopa Audubon
Society; Tucson Audubon Society; and
Cascabel Conservation Association*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lower San Pedro Watershed Alliance; Sierra Club; Center for Biological Diversity; Maricopa Audubon Society; Tucson Audubon Society; and Cascabel Conservation Association,<br><br>Plaintiffs,<br><br>v.<br><br>Col. Aaron Barta, in his official capacity as Commander of the Los Angeles District of the U.S. Army Corps of Engineers; and the U.S. Army Corps of Engineers,<br><br>Defendants. | No. _____<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.      The San Pedro River is the last, major free-flowing river in the desert southwest, a sanctuary for millions of migrating birds, and home to one of the most diverse assortment of animal and plant species in the United States.  Groundwater sustains the San Pedro River's flows, as well as its riparian vegetation and springs, especially during the seasons with little or no rainfall.

2.      Recognizing the importance of the San Pedro River, Congress designated 36 miles of the River's upper basin as the San Pedro Riparian National Conservation Area (SPRNCA), for which the United States holds an express federal reserved water right, to protect the River's aquatic and riparian resources, as well as its recreational, scientific, cultural, and wildlife values.  16 U.S.C. §§ 460xx(a), 460xx-1(d).

3.      In this increasingly arid environment, El Dorado Benson, LLC (El Dorado) obtained approval from the City of Benson, Arizona, to transform 12,167 acres of largely undeveloped habitat approximately two miles upland from the San Pedro River into a master-planned community that integrates 28,000 residential units with local businesses, open spaces, and luxurious amenities, including golf courses, resorts, fountains, lakes, and a town center.

4.      El Dorado proposes to pump groundwater from the underlying aquifer at a rate of 8,427 acre-feet per year to support 70,000 new residents and replicate an Italian ecosystem in the Sonoran desert of Arizona, as depicted below.



5.      This magnitude of groundwater pumping threatens the San Pedro River's surface and subsurface flows, irreversibly degrading the River's riparian habitat and adversely affecting hundreds of migratory bird species, including multiple endangered and listed species that depend on the River for their survival.  In addition, the proposed development would degrade thousands of acres of upland habitat and significantly alter surface hydrology, resulting in increased runoff and erosion into the San Pedro River.

6.      El Dorado cannot develop its proposed project—an integrated, master-planned community—on this site without a Clean Water Act Section 404 Permit from the U.S. Army Corps of Engineers (Corps).  The site is characterized by a dense network of ephemeral streams directly tributary to the San Pedro River.  These jurisdictional washes weave across the site like capillaries through tissue and cannot be disturbed without a 404 Permit from the Corps.

7.      El Dorado seeks to obtain authorization from the Corps to fill these jurisdictional washes through a phased permitting process.  El Dorado requested a 404 permit for an 8,212-acre portion of the proposed development, which would straddle 75-miles of jurisdictional waters.  El Dorado needs a permit to fill these washes at over 350 locations spread broadly across the site to develop a cohesive, master-planned community.  El Dorado will seek additional 404 permits from the Corps for the rest of the proposed development.

8.      Under these circumstances, the Corps has an obligation under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, *et seq.*, to thoroughly analyze the environmental consequences of granting a 404 Permit to El Dorado, including the significant adverse effects of the entire Vigneto development on upland habitat, surface hydrology, groundwater, riparian habitat, the SPRNCA(including federally reserved water rights), endangered species, and critical habitat.  *See White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1042 (9th Cir. 2009)

("Because this project's viability is founded on the Corps' issuance of a Section 404 permit, the entire project is within the Corps' purview.").

9.     In addition, the Corps must thoroughly analyze the impacts of the proposed Vigneto development to comply with the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq.*, and its implementing regulations, including the obligation to adequately mitigate the unavoidable impacts of granting a 404 Permit.

10.     The Environmental Protection Agency (EPA) repeatedly directed the Corps to prepare a comprehensive analysis of the entire Vigneto development based on high quality data, adequate public disclosure, and thorough NEPA analysis.

11.     Instead, the Corps prepared an incomplete Environmental Assessment (EA) that ignored the significant impacts of granting a 404 Permit for the Vigneto development.

12.     In the EA, the Corps artificially narrowed its scope of analysis in two ways to avoid analyzing the impacts of El Dorado's 12,167-acre master-planned community. First, the Corps limited its analysis to a so-called "Phase I" permitting area that encompasses 8,212 acre.  This permitting area does not, however, correspond with El Dorado's approved plan for the Vigneto development.  Instead, the Corps based this permitting area on a prior plan by a different developer that lapsed over a decade ago and did not encompass El Dorado's plan to build a 12,167-acre development.

13.     Second, the Corps narrowed its scope of analysis even further by claiming it could only analyze 1,919 acres within the 8,212-acre permit area.  The 1,919-acre scope of analysis included only: (1) the ephemeral washes to be filled under the 404 Permit and some upland areas around those washes; (2) avoided ephemeral washes and associated primary and secondary buffers around the avoided washes; and (3) an offsite parcel to be used for compensatory mitigation.

14.     The Corps justified its limited scope of analysis area by assuming that someone else could hypothetically develop the property, separate and apart from El Dorado's proposed project, without a 404 Permit.  Based on this assumption, the Corps

ignored the significant environmental consequences of its decision to grant a 404 Permit for the proposed Vigneto development, leading to a flawed EA and improper CWA analysis.

15.    The Corps' refusal to consider the impacts of the Vigneto development was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, violating the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06.  Plaintiffs bring this lawsuit asserting violations of the NEPA, the CWA, and their implementing regulations.

16.    Plaintiffs seek declaratory and injunctive relief to remedy the alleged violations of law set forth below.  Plaintiffs ask the Court to set aside and vacate the Corps' decision granting the 404 Permit.

## JURISDICTION AND VENUE

17.    Plaintiffs bring this action pursuant to the APA, 5 U.S.C. § 706(2), which waives the federal defendants' sovereign immunity, *see id*. § 702.

18.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

19.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and Rule 65 of the Federal Rules of Civil Procedure.  This Court also has inherent authority to award injunctive relief.

20.    This Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

21.    Venue is properly vested in this District pursuant to 28 U.S.C. § 1391(e)(i) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  The challenged federal action is a permit authorizing activities in Benson, Arizona.  Plaintiffs Lower San Pedro Watershed Alliance, Center for Biological Diversity, Maricopa Audubon Society, Tucson Audubon Society, and Cascabel Conservation Association, as well as the Grand Canyon Chapter of the Sierra Club, are headquartered within Arizona.

22.   This case should be assigned to the Tucson Division of this Court because the challenged federal action authorizes activities on property in Cochise County, which is within the Tucson Division.  *See* LRCiv 77.1(a), (c).

## PARTIES

23.   Plaintiff LOWER SAN PEDRO WATERSHED ALLIANCE (Watershed Alliance) is a landowner-based nonprofit conservation organization headquartered in Mammoth, Arizona.  The Watershed Alliance has nearly 200 members, about half of whom manage thousands of acres of land in the Lower San Pedro Basin.  Most of the members owning land in this watershed reside in Cochise County.  The organization is dedicated to protecting the threatened lower San Pedro riparian ecosystem and supporting watershed.  Its members regularly survey for western yellow-billed cuckoos, southwestern willow flycatchers, and other threatened and endangered species in the middle and lower San Pedro watersheds.  The Watershed Alliance has a history of advocacy on behalf of the San Pedro River—particularly the need to protect its flows from excessive groundwater pumping—and previously has written to the Corps and the City of Benson urging that endangered species and San Pedro stream flows be protected from the Vigneto development.

24.   Plaintiff SIERRA CLUB is a national nonprofit organization with 64 chapters and more than 630,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Grand Canyon Chapter of the Sierra Club is headquartered in Phoenix and has approximately 12,600 members in the state of Arizona.  The Sierra Club's concerns encompass protection of the San Pedro River, desert grasslands, and woodlands of the Whetstone Mountains.  The Sierra Club's members enjoy wildlife watching in these areas and have advocated for protections of endangered and threatened wildlife in the area, including the jaguar, ocelot,

southwestern willow flycatcher, and northern Mexican gartersnake.  Members of the Grand Canyon Chapter monitor water quality on the upper and middle San Pedro River each month from May through October and assist with annual wet-dry mapping of the River.  The Sierra Club has provided comments to the City of Benson on the proposed Villages at Vigneto development, and Sierra Club members have attended public meetings on Vigneto to oppose the development.

25.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (CBD) is a nonprofit corporation headquartered in Tucson, with more than 50,000 members.  CBD works to raise public awareness and to preserve, protect, and restore biodiversity, native species, ecosystems, and public lands.  CBD's members research, study, observe, publicize, and seek protection for ecosystems, plants, and animals, including the San Pedro River, jaguar, ocelot, yellow-billed cuckoo, southwestern willow flycatcher, lesser long-nosed bat, and northern Mexican gartersnake.  CBD and its members analyze and disseminate information to the public about the areas affected by the decreasing water levels in the San Pedro River.  CBD's and its members' extensive involvement in the San Pedro River includes over 25 years of activism and litigation, including advocacy to prevent the proposed Villages at Vigneto development's harmful environmental impacts.

26.    Plaintiff MARICOPA AUDUBON SOCIETY (Maricopa Audubon) is an organization of volunteers dedicated to the enjoyment of birds and other wildlife, with a primary focus on the conservation and restoration of the riparian habitat of the southwest through education and community involvement.  Maricopa Audubon is a nonprofit Arizona organization headquartered in Phoenix, with approximately 2,500 members. Maricopa Audubon has a long history of involvement with the San Pedro River, including being instrumental in the successful 1977 opposition to the proposed Charleston Dam, which would have inundated the southern half of the upper San Pedro River.  Maricopa Audubon's volunteers and members use, enjoy, and benefit from the San Pedro River for wildlife observation, research, education, and recreational activities.

27.     Plaintiff TUCSON AUDUBON SOCIETY (Tucson Audubon) is a nonprofit conservation organization that inspires people to enjoy and protect birds through recreation, education, conservation, and restoration of the environment upon which we all depend.  Founded in 1949, Tucson Audubon has more than 2,500 members.  Tucson Audubon established the Arizona Important Bird Area (IBA) Program in 2001, which seeks to identify and protect vital habitats for birds in Arizona, and is a steward of the Lower San Pedro Global IBA.  Tucson Audubon and its members have surveyed for western yellow-billed cuckoos in the Lower San Pedro Global IBA and in southeastern Arizona mountain ranges, including the Whetstone Mountains. Tucson Audubon advocated for the designation of the SPRNCA in 1988, the designation of the Upper San Pedro Global IBA by the American Bird Conservancy in 1996, the designation of the Lower San Pedro Global IBA in 2008, litigation to protect southwestern willow flycatcher critical habitat in 2009, and continues to advocate for the health of the watershed.

28.     Plaintiff CASCABEL CONSERVATION ASSOCIATION (CCA) is a nonprofit conservation group headquartered in Cochise County.  CCA is dedicated to the collaborative stewardship of the middle San Pedro watershed in a way that promotes the health, stability, and diversity of the whole community, including its earth, waters, plants, and animals.  Founded in 1997, CCA has about 150 members primarily from Cochise and Pima Counties.  CCA runs retreat and education programs to provide members of the public with information and an appreciation for the middle San Pedro watershed.  CCA has advocated for both the City of Benson and the Corps to more fully evaluate the impact the proposed Vigneto development would have on water resources and the riparian habitat of the San Pedro River.  For the last four years, CCA has conducted official surveys for western yellow-billed cuckoos on the San Pedro River in support of the National Audubon Society's IBA Program.

29.     Plaintiff Organizations have long histories of advocating for the protection of the San Pedro River ecosystem and its supporting watershed, and for the sensitive

species that rely on those habitats, including: filing legal challenges to other federal actions and development projects whose groundwater pumping threatened to reduce San Pedro River flows and degrade habitat; commenting on proposed rules to list species and designate critical habitat in the San Pedro watershed under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*; collecting and submitting data to federal agencies— including the Corps—on occurrences and habitat use by threatened and endangered species and other wildlife in the watershed; and sending letters to federal agencies and local political subdivisions urging that the San Pedro River, the watershed's native ecosystems, and the area's sensitive species be protected from large development projects, including the Villages at Vigneto.

30.     The Plaintiff Organizations submitted extensive comments regarding the significant effects of granting a 404 Permit on the environment, including the effects of construction activities, increased runoff and sedimentation, groundwater pumping, and induced growth.

31.     Plaintiff Organizations' members and staff derive educational, scientific, aesthetic, recreational, and spiritual benefits from the San Pedro River watershed, including its hemispherically-significant bird migration corridor, International Birding Areas, extraordinary biological diversity, and the ecosystem services the watershed provides.  Plaintiffs' members and staff enjoy activities that include viewing, studying, and photographing the birds, wildlife, and habitats in the middle and lower San Pedro watersheds, and have concrete plans to continue these activities.  Many of Plaintiffs' members live along the San Pedro River or in the middle or lower San Pedro watershed, and participate in these activities daily.

32.     Plaintiffs' members also live and own property in close proximity to the proposed Vigneto development, including in the alluvial fan—a triangle-shaped deposit of sediment—immediately downstream from the proposed development.  These members enjoy the peace and solitude of the San Pedro River valley, including the opportunity to birdwatch during the day, enjoy unspoiled vistas of the Whetstone

Mountains in the evening, and stargaze at night.  These members also depend upon the ephemeral washes that run across the Vigneto development to convey stormwater runoff from the Whetstone Mountains down to the San Pedro River.

33.    The Corps' decision to grant a 404 Permit for the Vigneto development threatens these members' recreational interests and enjoyment of their own property.  With a 404 Permit, El Dorado would fill and irreversibly alter the natural washes that protect these members' properties.  The development would also destroy thousands of acres of upland habitat, exponentially increasing runoff and erosion on these members' property.  In addition, the Vigneto development would increase light and noise pollution, while also degrading scenic vistas of the Whetstone Mountains.  Moreover, groundwater pumping at the proposed development would lower the groundwater table, impairing riparian habitat along the San Pedro River and adversely affecting Plaintiffs' enjoyment of species that depend on this habitat.

34.    The legal violations alleged in this complaint cause direct injury to the scientific, aesthetic, recreational, conservation, educational, spiritual, and other interests of Plaintiffs and their members and staff.  These are actual, concrete injuries to Plaintiffs, caused by Defendants' failure to comply with NEPA, the CWA, and their implementing regulations and policies.  Unless the requested relief is granted, Plaintiffs' interests will continue to be injured by the Defendants' failure to comply with NEPA and the CWA.  The relief sought herein would redress Plaintiffs' injuries.  Plaintiffs have no other adequate remedy at law.

35.    Defendant COLONEL AARON BARTA is sued in his official capacity as Commander and District Engineer of the Los Angeles District of the U.S. Army Corps of Engineers.  The Los Angeles District Engineer is responsible for issuing and overseeing dredge and fill permits under CWA Section 404 in the District, which includes Cochise County, Arizona.  The Los Angeles District office issued the section 404 Permit that is the subject of this litigation.

36.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS is the federal agency within the Department of Defense responsible for issuing dredge and fill permits under CWA Section 404.

## STATUTORY BACKGROUND

### I.     The Clean Water Act

37.     With the enactment of the CWA, Congress set forth a comprehensive program to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," to conserve the recreational value of such waters, and to protect wildlife species that rely on aquatic resources for their survival.  33 U.S.C. § 1251(a).

38.     Section 404 of the CWA authorizes the Corps to regulate and issue federal permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  *Id.* § 1344(a).

39.     A "discharge" is defined as "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12) and (16).  "Dredged material" is "material that is excavated or dredged from waters of the United States."  33 C.F.R. § 323.2(c).  "Fill material" includes any material placed in waters of the United States that has the effect of "replacing any portion of a water of United States with dry land;" or "changing the bottom elevation of any portion of a water of the United States."  *Id*. § 323.2(e)(1)(i)–(ii).

40.     "Navigable waters" means the "waters of the United States."  33 U.S.C. § 1362(7).  "[W]aters of the United States" includes "[a]ll interstate waters," "[a]ll tributaries . . . of [interstate waters]," and "[a]ll waters . . . whether they are determined . . . to have a significant nexus to a[n interstate water]."  33 C.F.R. § 328.3(a)(1), (5), (7).

41.     When it reviews a permit application, the Corps must follow binding guidelines established by the Corps and the EPA (the "404(b)(1) Guidelines" or the "Guidelines"), which are codified at 40 C.F.R. Part 230.  *See* 33 U.S.C. § 1344(b).

42.     The Guidelines prohibit the permitting of projects in three instances relevant to this case.  First, the Corps shall not issue a Section 404 permit "if there is a

[1] practicable alternative to the proposed discharge [2] which would have less adverse impact on the aquatic ecosystem, [3] so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  *Id*. § 230.10(a)(2).

43.     Second, the 404(b)(1) Guidelines prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  *Id.* § 230.10(d).  Consequently, those seeking a 404 permit must mitigate the impacts of the proposed dredge and fill activities by "avoiding, minimizing, rectifying, reducing, or compensating for resource losses."  33 C.F.R. § 320.4(r)(1).  The Corps "must determine the compensatory mitigation to be required in a DA [404] permit, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity."  40 C.F.R. § 230.93(a)(1).  In making this determination, "the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project."  *Id.*

44.     Third, the Corps is prohibited from issuing a 404 permit if the proposed discharge of dredged or fill material "will cause or contribute to significant degradation of the waters of the United States."  *Id.* § 230.10(c).  Effects contributing to significant degradation include adverse effects on human health or welfare; life stages of aquatic life and other water dependent wildlife; aquatic ecosystem diversity, productivity, and stability; and recreational, aesthetic, and economic values.  *Id.*

45.     Under the 404(b)(1) Guidelines, mitigation activities follow a three part sequence.  First, the district engineer must ensure that potential impacts from permitted activities have been avoided to the maximum extent practicable.  *Id.* § 230.91(c).

Second, remaining unavoidable impacts must be minimized to the extent appropriate and practicable.  *Id.*  Third, compensatory mitigation is then required for any impacts that cannot be avoided or minimized.  *Id.*

46.     Mitigation efforts must be monitored for an adequate period of time to ensure the project meets its performance standards and objectives.  *Id.* § 230.96(b).  A longer monitoring period is required where the aquatic resources at issue have slow development rates.  *Id.*

47.     The Corps must make a finding of non-compliance with the 404(b)(1) Guidelines where "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines."  *Id.* § 230.12(a)(3)(iv).

48.     In addition to the 404(b)(1) Guidelines, the Corps has promulgated regulations that prohibit issuance of a any permit if the "district engineer determines that it would be contrary to the public interest."  33 C.F.R. § 320.4(a)(1).   This far-reaching inquiry requires the Corps to consider "the probable impacts" of a proposed project on "[a]ll factors which may be relevant to the proposal[,] including cumulative effects."  *Id.* The decision should "reflect the national concern for both protection and utilization of important resources."  *Id.*

49.     The CWA imposes strict penalties, including civil and criminal sanctions, on any unauthorized discharge of a pollutant (including dredge or fill material) into waters of the United States.  33 U.S.C. § 1319.

## II.     The National Environmental Policy Act

50.     NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a).  Congress enacted NEPA "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action."  *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

51.   NEPA implements the precautionary principle to think first, then act by requiring agencies, "to the fullest extent possible . . . use all practicable means, consistent with the requirements of [NEPA] and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."  40 C.F.R. § 1500.2(f).

52.   The scope of the NEPA analysis is essential to an informed decision regarding the effects of the proposed action.  NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making so that the agency will not act on incomplete information, only to regret its decision after is it too late to correct.

53.   A comprehensive analysis under NEPA also ensures that the public has sufficient information to participate in the agency's decision-making process.

54.   A Section 404 dredge and fill permit issued by the Corps is a "Federal action" to which NEPA applies.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005).

55.   The Corps "has responsibility under NEPA to analyze all of the environmental consequences of a project.  Put another way, while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility.  The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all."  *Id.* at 1122.

56.   The Corps' NEPA regulations recognize that the scope of analysis for a 404 permit decision must

> address the impacts of the specific activity requiring a [Corps] permit and
> *those portions of the entire project over which the district engineer has
> sufficient control and responsibility to warrant federal review* . . . .  Federal
> control and responsibility will include the portions of the project beyond the

limits of Corps jurisdiction where the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project.

33 C.F.R. Pt. 325 App. B §§ 7(b)(1), 7(b)(2)(A) (emphasis added).

57.     In order to determine whether sufficient control and responsibility exist over the proposed project, the Corps typically considers the following factors:

(i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).
(ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
(iii) The extent to which the entire project will be within Corps jurisdiction.
(iv) The extent of cumulative Federal control and responsibility.

*Id.* § 7(b)(2).

58.     To fulfill Congress's twin aims of comprehensive environmental analysis and broad and informed public involvement, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

59.     To determine whether an EIS is required, the responsible agency may prepare an Environmental Assessment (EA) with "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.  The agency may forego preparation of an EIS if it makes a "finding of no significant impact" (FONSI), *id.* §§ 1501.4(e), 1508.13, and provides a convincing statement of reasons to explain why a project's impacts are insignificant.

60.     If the EA establishes that the agency's action may have a significant effect upon the environment, an EIS must be prepared.

61.     Relevant factors in determining whether an EIS is necessary include "considerations of both context and intensity."  40 C.F.R. § 1508.27.  Some of the factors relevant to "intensity" are:

- Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

- The degree to which the effects on the quality of the human environment are likely to be highly controversial.

- The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

- Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

- The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA.

- Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.* § 1508.27(b)(3)–(5), (7), (9)–(10).

62.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action to inform its decision about whether a proposed action significantly impacts the environment.  *Id*. §§ 1502.16, 1508.8, 1508.25(c).

15

63.     Agencies must also take a hard look at mitigation measures for a proposed action in order to evaluate the severity of the action's adverse effects.  *Id.* §§ 1502.14(f), 1502.16(h), 1508.25(b)(3).  A reasonably complete discussion of mitigation measures requires an assessment of whether the proposed mitigation measures will be effective. Agencies also must adopt a monitoring and enforcement program for any mitigation.  *Id.* § 1505.2(c); *see also id.* § 1505.3 (providing that agencies should "provide for monitoring to assure that their decisions are carried out").

### III.    The Administrative Procedure Act

64.     The APA confers a right of judicial review on any person adversely affected by final agency action, and provides for a waiver of the federal government's sovereign immunity.  5 U.S.C. §§ 701–06.

65.     Upon review of agency action, the court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *Id.* § 706(2).   An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Further, "the agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (quotations and citations omitted)).

## STATEMENT OF FACTS

### I.  The San Pedro River and Watershed

#### A.  The Last Major Free-Flowing River in the Desert Southwest

66.     The San Pedro River is one of the most significant perennial undammed desert rivers in the United States and is unquestionably an aquatic resource of international ecological importance.



67.    The River and its surrounding cottonwood-willow forest support one of the most important corridors for millions of migratory songbirds in the United States.  It also serves as important habitat for many other species of plants, fish, and wildlife, and provides a unique refuge for many threatened or endangered species protected by the ESA, including the jaguar, western yellow-billed cuckoo, southwestern willow flycatcher, northern Mexican gartersnake, and Huachuca water umbel.

68.    The San Pedro River is also a globally important bird area.  Thousands of bird watchers visit the San Pedro River each year to view native and migrating songbirds, generating millions of dollars in economic activity for the local economy. The total economic effect from watchable wildlife activities in Arizona in 2011 was estimated at $1.4 billion, which includes $14.2 million dollars in retail sales in Cochise County and $179.5 million in retail sales in Pima County.

**B. The San Pedro Riparian National Conservation Area**

69.    In 1988, Congress recognized the importance of the San Pedro River and designated 36 miles of the river's upper basin as the SPRNCA.  Congress mandated that SPRNCA be managed "to protect the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the public lands surrounding the San Pedro River." 16 U.S.C. § 460xx(a).

70.    The United States holds an express federal reserved water right to accomplish the purposes of the SPRNCA reservation.  Congress reserved federal water rights in "a quantity of water sufficient to fulfill the purposes" of the SPRNCA, *id.* § 460xx-1(d), including rights to springs and to groundwater to support riparian vegetation, *id.* § 460xx(a).

71.    St. David Cienega is a large groundwater-fed wet marsh within the northern boundary of the SPRNCA and lies adjacent to the San Pedro River floodplain.  The Bureau of Land Management (BLM) manages this site as a Research Natural Area within the SPRNCA.  Due to the extent of species supported by St. David Cienega, the Audubon Society included it as a part of the San Pedro Important Bird Area.

72.    A retired Fish and Wildlife Service (FWS) employee observed a ten-meter long and approximately 0.5 meter wide patch of endangered Huachuca water umbel in May of 2017 next to St. David Monastery.   This stretch of the San Pedro River is intermittent and depends heavily on discharge flows from the St. David Cienega.

73.    St. David Cienega is an important indicator of the health of SPRNCA and the San Pedro River.  Recent declines in water depth at St. David Cienega and the area of wetted land, and the loss of wetland vegetation, threaten the ecological integrity of the San Pedro River basin, and for the St. David Cienega in particular.

**C. Groundwater Pumping Threatens Surface Flows Along the San Pedro River and at SPRNCA.**

74.    The San Pedro River, SPRNCA, and their lush corridors of riparian habitat depend on groundwater contributions from the regional aquifer.  Pressure in the regional

aquifer causes groundwater to move from the deep, regional aquifer, up into the shallow aquifer, and then into the River as baseflow. Without baseflow, the ecological function of the River is impaired, and the purposes of SPRNCA are undermined.

75.    Groundwater studies have demonstrated that an area of vertical flow between the deep and shallow systems is likely present along the San Pedro River near St. David Cienega.

76.    Chris Eastoe, a hydrologist and expert in isotope geochemistry, conducted isotope testing at St. David Cienega in 2017. His results demonstrated that surface discharges at the Cienega were isotopically and thermally similar to the confined aquifer. These results clearly show that there is a hydrologic connection between the confined aquifer and the surface flow system of the San Pedro River at St. David Cienega.

77.    In 2018, Eastoe conducted additional isotope testing and confirmed that there is a permeable zone connecting the San Pedro River to the confined aquifer at St. David Cienega. Due to this connection, large increases in groundwater withdrawal from the confined aquifer would likely effect groundwater discharge from the aquifer at the Cienega and nearby springs.

78.    Groundwater pumping is the greatest threat to the San Pedro River because it lowers the water table and creates an expanding cone of depression. The expanding cone of depression eventually "captures" water from the aquifer that would have otherwise reached the surface near the River and sustained riparian habitat or River and spring flows. Drawdown associated with the cone of depression also reduces the groundwater volume in storage in the aquifer.

79.    Even small reductions in the aquifer caused by groundwater pumping could reduce the aquifer's artesian head, or the aquifer's natural pressure that forces water to the ground surface, thereby eliminating or even reversing flows at seeps and springs near St. David Cienega.

80.     Groundwater pumping is already reducing stream flow levels along the San Pedro River.  Over the last several decades, the rate of groundwater pumping from aquifers feeding the San Pedro River has far exceeded the rate of recharge of water to the aquifer, creating a groundwater "deficit."  This pumping has begun to dry up the San Pedro River and its riparian vegetation and springs, leaving the San Pedro River with little or no water to spare.

81.     Because there is a time lag between groundwater pumping and the point at which pumping affects a river, a well's effects on baseflows may not be fully realized until decades after the well stops pumping.  This is because the cone of depression created by groundwater pumping gradually radiates laterally until its edge is close enough to a stream that it begins to affect baseflows.

### D. Groundwater Pumping Threatens Riparian Habitat Along the San Pedro River.

82.     There is a cause-and-effect relationship between groundwater drawdown and loss of riparian habitat:

> The reduction in groundwater lowers the water table, while the reduction in streamflow reduces the length, width, and depth of wetted streambed. The net result is reduced plant regeneration, herbaceous and shrub growth, tree survival, foliar cover, woodland width, and prey abundance that coincides with the reduced length, width, and depth of wetted streambed and depth to groundwater.

FISH AND WILDLIFE SERV., DEP'T OF THE INTERIOR, AMENDED FINAL REINITIATED BIOLOGICAL AND CONFERENCE OPINION FOR THE ROSEMONT COPPER MINE, PIMA COUNTY, ARIZONA 242 (2016).

83.     Even minor declines in groundwater levels can have devastating impacts on riparian vegetation and the associated ecosystem.  Increasing depths to groundwater will eventually change the species composition of a sites' riparian community, i.e., hydroriparian communities would suffer decreased vigor and extent, and transition to a xeroriparian community.

84.    Cottonwood-willow gallery forests require fairly persistent streamflows and shallow (high) groundwater depths to survive.  This habitat will die off wherever the San Pedro River dries up.

85.    If the water table in the Benson subarea continues to drop, sufficient groundwater likely would not reach the surface to support the springs and riparian vegetation in the SPRNCA.

### E.  Surface Water Diversions Threaten the San Pedro River

86.    Desert washes provide important ecological and hydrological functions. Among other things, desert washes help reduce erosion and improve water quality, recharge groundwater, provide wildlife habitat and migration corridors, and filter water.

87.    Desert washes are lined with larger and denser vegetation than the surrounding habitat, thereby providing forage, cover, and nesting or denning habitat for desert animals.  This vegetation is known as xeroriparian habitat.

88.    Filling desert washes can alter the volume, duration, and frequency of water flows from those washes into downstream waters.  Filling desert washes also can alter the amount of sediment transported from the washes into downstream waters.  Changes in sediment transport from the washes can alter downstream riparian habitat and the washes' xeroriparian habitat.  Such habitat alterations can harm wildlife and aquatic ecosystems.

### F.  Climate Change Will Exacerbate Threats to the San Pedro River

89.    A group of expert hydrologists studied and modeled the impacts of climate change on eight aquifers in the southwest United States, including the San Pedro basin. They found that existing data demonstrate that groundwater recharge in the San Pedro basin will decrease from between 30% to 100% over the next 100 years.

90.    The EPA has also noted that climate change will worsen already fragile conditions in the southwest, explaining that groundwater pumping in the region is already lowering water tables in this region.

91.    A group of climate scientists also found that, based on modeling climate change simulations, "the risk of a decade-scale drought occurring this century is at least 50% for most of the greater southwestern United States and may indeed be closer to 80% . . . .  The probability of multidecadal megadrought is also high: the likelihood of a 35-yr event is between 10% and 50%."

## II.    The "Villages at Vigneto" Master-Planned Community

### A. El Dorado's Plan for an Integrated Community

92.    In 2006, Pulte Homes proposed, and received preliminary approval from the City of Benson, to construct an 8,212-acre master-planned community, known as the Whetstone Ranch, adjacent to the San Pedro River.  Pulte Homes obtained a 404 Permit from the Corps for the proposed development.  However, Pulte Homes never received final approval to construct the development from the City of Benson.  As a result, the preliminary approval lapsed, and Pulte Homes did not develop the property.  Rather, it sold approximately 12,339 acres of undeveloped lands to El Dorado in May 2014.

93.    El Dorado now plans to construct a 12,167-acre master-planned community, known as the Villages at Vigneto on these same lands.

94.    El Dorado spent two and a half years developing a Community Master Plan (Master Plan) for the Villages at Vigneto.  As El Dorado states, the Master Plan was "carefully considered and dynamically planned" to ensure a "harmonious," "cohesive," "connected," and "integrated" community.

95.    According to the Master Plan, El Dorado plans to build the Villages at Vigneto around a "Town Center"—the "heart of the community"—which would be located on a series of community lakes and contain a mix of commercial and office uses, as depicted below.



96.    The proposed development would include residences (28,000 dwellings), commercial developments (271 acres/3 million square feet), golf courses (four, totaling 546 acres), a resort (220 acres), open spaces (1,624 acres), and a Town Center (115 acres), among other things.

97.    The proposed development would generate 237,607 vehicle trips per day.

98.    To safely and efficiently handle this volume of traffic, El Dorado prepared a Transportation Master Plan, which sets forth an integrated transportation network that would rely on a series of looping arterial, collector, and local roadways to provide internal circulation within the project and access to State Route 90.

99.    The Transportation Master Plan predicts that the majority of vehicle trips would begin and end within the Vigneto development due to this interconnected transportation network, thereby reducing the need for vehicles to exit the development and use State Route 90.  This network also ensures that emergency services, such as police and fire crews, can respond to any emergency within the Vigneto development in less than five minutes.

100.   The proposed transportation network would also include a network of multi-use paths for golf carts or similar electric vehicles, which would reduce internal trips via automobile by 60% and limit traffic noise, pollution, and congestion.  By placing emphasis on multi-use paths, El Dorado claims that the transportation network would encourage greater neighborhood interaction and a more attractive environment.

101.   The lifestyle of the residents within the Villages at Vigneto depends largely on the degree of mobility/access that the roadways, multi-modal pathways, and sidewalks provide.  Transportation infrastructure must provide connectivity to regional roadways, address traffic control needs, and create well-coordinated circulation throughout the development.

102.   El Dorado prepared a preliminary traffic analysis to ensure that the proposed transportation network would be safe, efficient, and meet traffic control needs. The report assumed the vast majority of vehicle travel would be satisfied internally by alternate means (i.e. golf carts), and thus would not depend on State Route 90.  Even with this interconnected network and alternate modes of transport, the increased traffic along State Route 90 would border on unstable flows.  State Route 90 only has the capacity to handle 30,600 vehicles per day.

103.   The City of Benson approved the Master Plan for the 12,167-acre Villages at Vigneto because it determined that the Master Plan sets forth design parameters to ensure that the proposed development complies with the City's General Development Plan, including the requirements for land use and circulation.

104.   The City of Benson prohibited El Dorado from making any major amendments to the Master Plan without approval from the Benson City Council.  Major amendments include, but are not limited to, changing arterial street intersections at locations other than presented in the plan, or materially changing the objectives or goals of the Master Plan.

105.   El Dorado signed an agreement with the City of Benson to develop the Villages at Vigneto consistent with the approved Master Plan.

106.   El Dorado applied to the City of Benson to form ten special taxation districts to secure financing for the construction and acquisition of public infrastructure for the Vigneto development, as set forth in the Master Plan.  The City of Benson approved the formation of all ten special taxation districts.

107.   El Dorado would rely on these taxation districts to raise almost $1 billion in public financing needed to develop the infrastructure and utilities essential to the Master Plan.  This funding is contingent on El Dorado's compliance with the Master Plan.  With this money, El Dorado plans to develop the districts in sequential order on an accelerated timeline, commencing with Units 1 through 9, and moving on to the remaining units (Units 10–14).  The Master Plan projects a twenty-year buildout.

108.   El Dorado has acquired all 12,167 acres of land subject to the Master Plan. El Dorado continues to acquire additional lands adjacent to the Villages at Vigneto development.  El Dorado signed a new development agreement with the City of Benson allowing it to expand the Vigneto development by an additional 2,433 acres on adjacent or contiguous lands that it now owns or will purchase.

109.   El Dorado has aggressively marketed the Villages at Vigneto as a world-class community that facilitates a socially interactive lifestyle found nowhere else in North America.  El Dorado created a marketing video for the Villages at Vigneto, which is available online at https://vignetoaz.com/.  The marketing video reinforces El Dorado's reliance on the interconnected transportation network and system of interrelated villages to develop a cohesive 12,167-acre community.

**B. El Dorado Seeks 404 Permits through a Phased Permitting Process**

110.   In June 2016, the Corps suspended the 404 permit for the prior Whetstone Ranch proposal.  No development has occurred since then.

111.   Even though the City of Benson approved the Master Plan's cohesive 12,167-acre plan for the Villages at Vigneto, El Dorado asked the Corps to reinstate the 404 Permit for just the prior Whetstone Ranch proposal, which covered only 8,212 acres.  If El Dorado can secure the 404 Permit for 8,212-acres, it asserts that it will

obtain additional 404 Permits for the remaining 3,955 acres of the Vigneto development at a later time.

112.   In October 2017, the Corps initiated the process of evaluating whether to reinstate, modify, or revoke the 404 Permit for the prior Whetstone ranch proposal.  The Corps based its permit boundary on the prior 8,212-acre Whetstone Ranch proposal, not the 12,167-acre Villages at Vigneto development proposed by El Dorado.

113.   The Corps labeled its 8,212-acre permit boundary as Phase I of the Vigneto Development.  The Master Plan does not, however, identify an 8,212-acre "phase" of the planned development.

114.   The so-called "Phase I" permit boundary does not align with the boundaries of the significantly larger 12,167-acre proposed Villages at Vigneto.

115.   The permit boundary used by the Corps does not align with the planning units laid out in the Master Plan, either.  Multiple planning units overlap and extend beyond the 8,212-acre permit area, including Units 10 and 11.

116.   The remaining planning units (Units 12–14), which are outside of the 8,212-acre permit boundary, do not contain core elements of the development like the Town Center or Golf Center.  Nor do they contain any Information Centers, Community Recreation Centers, or Public Services.  The remaining planning units contain unique elements, such as the 220-acre resort, that are part of El Dorado's comprehensive vision for the Villages at Vigneto.

### C. El Dorado Needs a 404 Permit to Develop an Integrated Master-Planned Community

117.   El Dorado requested the 404 Permit for the Vigneto development based on its purpose and need to develop "a master-planned community with interrelated villages in or proximate to the City of Benson, Arizona, and proximate to regional transportation infrastructure."

118.   The Corps stated that the overall project purpose is to build a master-planned community consisting of residential, commercial, and recreational facilities,

including all appurtenant features such as building pads, roads, and utilities, in the Benson, Arizona, area that is proximate to local, regional, and national transportation facilities.  It noted that El Dorado seeks to construct a development with interrelated villages and a well-coordinated transportation network that provides for circulation throughout the development.

119.   The Corps' 8,212-acre permit area is characterized by a dense network of 475 acres of braided ephemeral streams directly tributary to the San Pedro River.  There are at least 75 miles of jurisdictional washes (i.e., waters of the United States) within the permit boundary.  These ephemeral washes weave across the project site, as depicted by the red lines in the map below.



120.   El Dorado would need to fill these jurisdictional washes, at over 350 locations broadly dispersed across the site, to develop the transportation network and utility crossings essential to the Master Plan, as depicted below:



121.   El Dorado would also have to fill jurisdictional washes to achieve the "harmonious" balance of uses set forth in the Master Plan, including residential housing, commercial development, golf courses, recreation centers, and parks.

122.   El Dorado requested a 404 Permit to fill 51 acres of jurisdictional waters associated with the 8,212-acre permit area.

123.   The jurisdictional washes on the site are so ubiquitous that El Dorado requested a special "flexibility" condition in the permit to allow fill activities anywhere along the 475-acres of ephemeral washes on the property, instead of at fixed locations.

124.   El Dorado submitted a Habitat Mitigation and Monitoring Plan (HMMP) to mitigate the impacts to jurisdictional washes.  The HMMP includes onsite mitigation activities (i.e., avoiding jurisdictional washes on the Vigneto development and upland buffers) as well as activities on a 144-acre offsite parcel along the San Pedro River.

## III.    Granting a 404 Permit Will have a Significant Impact on the Environment.

### A.   The Vigneto Development Threatens The San Pedro River and SPRNCA.

125.   The Vigneto development would significantly impact the San Pedro River and the SPRNCA by altering surface runoff patterns within the watershed and increasing the depth to groundwater.

#### 1.    The Vigneto Development Would Alter Surface Runoff Patterns.

126.   Hydrologists with the U.S. Department of Agriculture (USDA) and EPA conducted a hydrologic modeling study of the previously proposed Whetstone Ranch development to assess the impacts of that development on the San Pedro River.  Their results "definitively indicate that the proposed land-use changes [for the Whetstone Ranch] will result in significant alteration of the hydrologic regime both within and downstream of the impacted watersheds where they empty into the San Pedro River."

127.   Increases in sediment yield would be the most significant for the smaller, more frequent rainfall events.  For the two-year, one-hour event, average runoff and sediment yield increased 413% and 231%, respectively, for the Whetstone Ranch proposal.

128.   The Vigneto development is at least 3,955-acres larger than the Whetstone Ranch proposal modeled by the USDA and EPA hydrologists, increasing impervious surfaces within the same watersheds.  Runoff from Vigneto, thus, would be even greater

than that amount projected for Whetstone Ranch, with even more severe impacts to the San Pedro River and wildlife that depends upon the River.

129.   Increased surface runoff and/or sediment yield would result in harmful impacts to the aquatic ecosystem.  These impacts would include more frequent and severe flooding, stream channel adjustment, stream bank erosion, water quality degradation from sedimentation and contaminant transport, habitat destruction and decreased biological diversity.

### 2.   Groundwater Pumping Would Increase Depth to Groundwater and Capture Surface Flows.

130.   The City of Benson allocated 12,000 acre-feet of water per year to the Villages at Vigneto, nearly 15 times Benson's current groundwater demand of approximately 800 acre-feet per year.

131.   El Dorado would need at least 6,032 acre-feet per year for the 8,212 acres of the development in the permit area and up to 8,427 acre-feet per year for the entire 12,167-acre development.

132.   Groundwater pumping at the Vigneto development poses two threats to surface flows on the San Pedro River.  First, pumping intercepts groundwater flowing east from the Whetstone Mountains that otherwise would flow into the San Pedro River and maintain the River's base-flows.  Second, groundwater pumping lowers the water table in the regional aquifer to levels that are too low for the aquifer's groundwater to flow into the alluvial aquifer and the San Pedro River.

133.   Dr. Robert Prucha, an expert in hydrogeology and water resource engineering, updated a prior, peer-reviewed groundwater model to evaluate the potential impacts of groundwater pumping at the Villages at Vigneto development.  The groundwater model predicts that groundwater pumping at the Vigneto development would spread to distant quarters of the aquifer system due to the effects of the confining layer.

30

134.   The model predicts that groundwater pumping at the Vigneto development could drawdown the aquifer below the San Pedro River east of the Development Project by 10 meters after 100 years.  The groundwater model also predicts that groundwater drawdown could adversely impact spring flow in the St. David Cienega area on the order of 0.25 to 0.45 meters after 100 years.

135.   Another expert hydrologist reviewed Dr. Prucha's groundwater model, concluding that the model is reasonable given that St. David Cienega is a known discharge point for groundwater in the basin.  The same hydrologist rejected the Corps' prior assumption that the groundwater aquifer was not connected to the unconfined aquifer that feeds the San Pedro River and St. David Cienega.

136.   The magnitude of predicted drawdown would have a significant impact on the San Pedro River along this stretch, which is already losing water to the aquifer.  The projected drawdown would increase depth to groundwater, eventually resulting in the loss of riparian communities (i.e., hydroriparian communities would suffer decreased vigor and extent, eventually transitioning to a xeroriparian community).

137.   The projected groundwater drawdown could also capture groundwater discharges at St. David Cienega, potentially impairing riparian habitat at the SPRNCA and infringing on the federally reserved groundwater rights that support these areas.

138.   Climate change will exacerbate the impacts of groundwater drawdown on the San Pedro River, the SPRNCA, and riparian habitat.

**B. The Vigneto Development Would Negatively Impact Listed Species and Critical Habitat**

139.   The Vigneto development would cause a suite of habitat loss-related impacts to the western-yellow billed cuckoo, southwestern willow flycatcher, northern Mexican gartersnake, and Huachuca water umbel, including their proposed and final critical habitat.

140.   All of these species depend on suitable habitat along the San Pedro River for their survival.  The southwestern willow flycatcher is an obligate riparian bird, the

western yellow-billed cuckoo is strongly associated with riparian and adjoining upland areas, the northern Mexican gartersnake is strongly aquatic (although it does range well into upland areas when foraging), and the Huachuca water umbel is a semi-aquatic plant that occurs in streams and riparian areas.

141.   Any appreciable (i.e. measurable) loss of stream flow, regardless of its cause, constitutes an adverse effect on threatened and endangered aquatic species, and, as applicable, proposed and final critical habitat.

142.   Groundwater pumping at the Vigneto development would increase the depth to groundwater, thereby negatively impacting these species by reducing (1) surface flows and riparian and mesquite habitat quality and quantity, (2) prey population, and (3) flood flows that promote regeneration, as well as scouring out any regeneration that grows in the stream channel.

143.   Groundwater pumping would likely cause a transition of the San Pedro River from a hydroriparian to xeroriparian corridor with significant adverse effects on the western yellow-billed cuckoo, southwestern willow flycatcher, northern Mexican gartersnake, and Huachuca water umbel.

144.   Climate change would further exacerbate the impacts of groundwater drawdown on these species.

145.   In addition, the Vigneto development would transform thousands of acres of upland habitat into impervious surfaces.  The increased runoff and sediment generated by these impervious surfaces would adversely affect yellow-billed cuckoos, northern Mexican gartersnakes, and southwestern willow flycatcher that depend on downstream habitat along the San Pedro River, including designated and proposed critical habitat.

146.   The Vigneto development would also eliminate upland habitat designated as critical habitat for the jaguar and likely used by the western yellow-billed cuckoo.

IV.     **The EPA and Public Urge the Corps to Analyze the Effects of the Vigneto
        Development.**

147.   The EPA submitted multiple comment letters urging the Corps to prepare a
NEPA analysis based on the Master Plan to adequately address the direct, secondary,
and cumulative impacts of the 12,167-acre master-planned community.  In addition, the
EPA explained that the Corps needed to ensure adequate mitigation of impacts to
jurisdictional waters of the United States.

148.   During the Corps re-evaluation of the 404 Permit following its suspension
in 2016, EPA reiterated its prior objections to the 404 Permit for the Whetstone Ranch,
including (1) the limiting of the Corps' NEPA scope of analysis area through an
unrealistic, impracticable "no federal action" alternative which fails to meet the project
purpose; (2) the lack of an adequate analysis of alternatives to demonstrate the
maximum practicable level of avoidance and minimization of adverse impacts to waters
of the United States, as required by Section 404(b)(1) of the CWA; and, (3) the lack of
an adequate compensatory mitigation plan to replace the functions and values of waters
lost to unavoidable impacts.

149.   Pursuant to 40 C.F.R. § 230.12(a)(3)(iv), the 404(b)(1) Guidelines and
NEPA, the EPA recommend that the Corps reconsider its findings, require meaningful
compliance from the applicant, or deny the permit.

150.   The Corps identified a total of 4,467 letters, emails, or phoned-in
comments.  In addition, the public submitted approximately 15,000 letters roundly
condemning the proposed 404 Permit due to the unanalyzed impacts of groundwater
pumping on the San Pedro River and ecosystem.

151.   Plaintiffs submitted comments to the Corps on December 4, 2017, urging
the Corps to prepare a thorough EIS analyzing the environmental impacts of the Villages
at Vigneto development.

152.   Plaintiffs submitted additional comments to the Corps on January 12, March 16, and June 15, 2018, identifying new information regarding the impacts of the proposed Vigneto development.

## V.   The Corps Limits Its Analysis of the Vigneto Development.

153.   On October 17, 2018, the Corps finalized an EA and Statement of Findings in connection with the 404 Permit for the 8,212-acre permit area for the Villages at Vigneto.

### A.   The Corps Limits the Scope of Analysis Area and Foregoes Preparation of an EIS.

154.   The Corps' scope of analysis area did not encompass the 12,167-acre Vigneto development, as proposed by El Dorado in the Master Plan.

155.   Rather, the Corps defined the scope of analysis area to include only 1,775 acres within the Vigneto development, as well as the 144-acre offsite parcel, for a total of approximately 1,919 acres.  The 1,775-acrea onsite area consists of (1) 475 acres of waters of the United States, (2) 100 acres of upland areas adjacent to the washes to be filled, (2) 385 acres of primary buffers around all unfilled washes, and (4) 815 acres of upland secondary buffers around the unfilled washes.

156.   The Corps concluded that the effects of its decision within this scope of analysis area would not have a significant impact on the environment.  Accordingly, the Corps did not prepare a comprehensive EIS.

157.   The Corps defined its scope of analysis area based on an assumption that someone else could hypothetically develop the property, separate and apart from the proposed Vigneto development, without a 404 Permit (i.e., the No Action Alternative).

158.   The Corps concluded that the No Action Alternative was unreasonable and impracticable because it would not meet El Dorado's overall project purpose or its need to develop a cohesive master-planned community on the site.

159.   The Corps explained that several "key objectives, principally related to transportation and access and to land use" cannot be achieved without the 404 Permit.

An "effective north-south transportation network" would not be possible due to the jurisdictional washes crisscrossing the property.  As a result, access to the property would "be limited to right in and right out turning movements" along State Route 90, precluding an integrated roadway system and constraining "the integration of multi-modal transportation pathways with parks, golf courses, and the Village Center."

160.   However, there is no evidence that a hypothetical road system under the No Action Alternative could handle 237,607 vehicle trips per day—the amount of vehicle trips projected in the Master Plan for a community of 28,000 residences and commercial spaces.  El Dorado has not prepared a Transportation Master Plan or conducted a preliminary traffic analysis to ensure that the No Action Alternative includes a safe and effective transportation network.

161.   Due to the lack of an interconnected transportation network under the No Action Alternative, residents would rely to a much greater extent on State Route 90 to provide north-south access to other portions of the hypothetical development.  The resultant increase in vehicle trips would overwhelm the capacity of State Route 90, which can only handle 30,600 trips per day within an acceptable level of service.  Traffic volumes in excess of 30,600 would lead to forced or breakdown flow.  Drivers would experience at least an 80-second delay at every signalized intersection proposed under the No Action Alternative for State Route 90 (of which there would be five) and at least a 50-second delay at every unsignalized intersection (of which there would be 15).  Fire, medical, or police services would not be able to respond to emergencies within 5 minutes.

162.   Additionally, as the Corps recognized in its analysis of the alternatives, there would be less demand for homes, and thus a decreased absorption rate under the No Action Alternative.  The City of Benson projects a housing unit growth rate of 4% over the next twenty years, resulting in an increase in total housing units from 3,065 in 2020 to 3,325 units in 2040.  There is no evidence the City of Benson would grow by

over 950% over this time frame—the amount of growth necessary to absorb 28,000 new residential units.

163.   To compensate for the lack of housing demand, El Dorado claims that it would develop vineyards and nut orchards on up to 3,000 acres of the 8,212-acre No Action Alternative.

164.   El Dorado admitted that it would not be able to "meet [its] project purpose" of developing an interconnected master-planned community or retain its "core concept of interconnected villages" without a 404 Permit.

165.   Consequently, El Dorado would likely subdivide and sell the property rather than develop it without a 404 Permit.  As the Corps explained with regard to the scope of analysis area, "[i]t is very likely that under a No Action Alternative development scenario, the development of the entire project will not be under the control of a single master developer."

166.   As such, El Dorado has not developed the details or planning decisions regarding the No Action Alternative.  El Dorado also has no plans and expresses no intention to develop the additional 3,955-acres of land identified in the Master Plan, if it does not receive the 404 Permit for the 8,212-acre permit area.  The entire development thus depends on a 404 Permit from the Corps.

167.   El Dorado does not have approval from the Benson City Council to develop the No Action Alternative, which would require major amendments to the Master Plan to increase the number of access points along State Highway 90 and materially change the objectives/goals of the Master Plan.

168.   Without a 404 Permit, no improvements to ephemeral washes will be made. Therefore, erosion hazard potential and lack of roadway connectivity within any future development may significantly hinder the potential of the City of Benson to ensure the required mix of housing to meet the city residential development needs and objectives. Moreover, the City's housing potential stock and diversity will significantly be reduced.

169.   There would be fundamental differences between the No Action Alternative and the proposed Vigneto development.  The No Action Alternative would not result in similar development since it loses the connectivity essential to a community, which by its nature contains multiple uses, and numerous uses are limited or eliminated.

## B.   The Corps Fails to Objectively Assess Less Environmentally Damaging Practicable Alternatives

170.   The Corps claims that it systematically screened alternatives in the EA to determine whether there were any practicable alternatives to the proposed discharge, which would have less adverse impacts on the aquatic ecosystem, without causing other significant adverse environmental consequences.

171.   The EA, however, used two conflicting scopes of analysis to eliminate less environmentally damaging practicable alternatives to the proposed Vigneto development.

172.   The Corps used an 8,212-acre scope of analysis to assess whether alternatives to the Vigneto development were practical.  According to the EA, in order to be practicable, an alternative must be available, achieve the overall project purpose, and be feasible when considering cost, logistics and existing technology.

173.   The Corps concluded that the No Action Alternative was not practicable because it would not meet El Dorado's overall project purpose for a master-planned community within the 8,212-acre permit area.  The Corps also rejected offsite alternatives because they did not meet the minimum 3,000-acre requirement for master-planned communities.

174.   The Corps used a narrower 1,919-acre scope of analysis to determine whether each alternative would cause other significant adverse environmental consequences.  Within this narrow scope of analysis, the Corps reasoned that granting a 404 Permit for the Vigneto development was less environmentally damaging than other alternatives because it includes restrictive covenants to protect 1,624 acres of avoided ephemeral washes and upland buffers on the development site, and restoration activities

on the 144-acre offsite parcel.  By comparison, the Corps reasoned that the No Action Alternative would have other significant environmental impacts within the 1,919-acre scope of analysis area.

175.   The Corps did not use an 8,212-acre scope of analysis to assess whether the Vigneto development or the No Action Alternative would cause other significant environmental impacts.

176.   The Corps did not consider the use of spanned crossings or other measures to avoid or minimize discharges into waters of the United States under the preferred alternative.  However, it determined that, under the No Action Alternative, El Dorado could avoid waters of the United States by using spanned crossings without placement of any structures (concrete, metal culvert or gunnite) in the channel bottoms.  El Dorado could also complete utility crossings without direct impact to any waters of the United States by using jack and bore, directional drilling, or placement within the road crossing spans.

### C. The Corps Fails to Adequately Mitigate the Impacts of the Project.

177.   The Corps determined that compensatory mitigation was necessary to offset the unavoidable impacts of the dredge and fill activities for El Dorado's proposed development under the 404 Permit.

178.   The HMMP purports to provide for compensatory mitigation "in perpetuity" for the unavoidable impacts of the permitted activity, i.e., the filling of 51 acres of jurisdictional washes on the development site.

179.   The HMMP includes activities on the development site, such as avoidance of 424 acres of ephemeral washes and 1,200 acres of primary and secondary buffers within the associated upland habitat of the ephemeral washes.

180.   The HMMP also includes activities on a 144-acre offsite parcel located just northeast and downstream of the development site along the San Pedro River.  The offsite parcel encompasses the active San Pedro River channel and associated riparian

habitat, adjacent active and abandoned floodplains, an artesian well and associated wetland habitat, and fallowed agricultural fields.

181. El Dorado proposes to undertake habitat restoration and erosion control activities on the offsite parcel, including (1) stabilizing and grading active gully head cut erosion by installing rock chutes and rip raps; (2) planting native trees and shrubs, and seeding with a native seed mix in a reclamation area around gully areas, around the artesian well, and in the active floodplain along the San Pedro River; and (3) revegetating of the fallowed agricultural fields.

182. The Corps relied on the onsite and offsite mitigation lands, as included in the HMMP, to conclude that El Dorado provided adequate compensatory mitigation for the unavoidable impacts of filling 51 acres of ephemeral washes on the development site.

183. At the same time, the Corps relied on the onsite and offsite mitigation activities to conclude that granting a 404 Permit was the least environmentally damaging practicable alternative, as noted above.

184. The HMMP assumes that the habitat restoration activities would be successful if the basic natural processes that support mesquite woodland habitat are still in place (*e.g.*, depth to groundwater, hydrology, and soils).

185. For example, the HMMP proposes to plant 400 cottonwoods on the offsite parcel, which require fairly persistent streamflows and shallow (high) groundwater depths to survive. The HMMP identifies the depth to alluvial groundwater on the offsite parcel as approximately 44 to 53 inches, and proposes to plant the cottonwoods with the rootball at least 48 inches below the ground surface and as close to the water table as possible.

186. The HMMP also presumes that the preservation, maintenance, and enhancement of the artesian well/wetland complex will successfully provide a perennial water source to wildlife in an area where surface water is limited. These wetlands

expand and contract depending on fluctuations in groundwater discharge from this system.

187.   The Corps did not analyze the impacts of groundwater pumping at the Vigneto development on these proposed mitigation activities or the cumulative impacts of climate change.  As discussed above, though, the Vigneto development would significantly lower depth to groundwater and hydrology thereby depleting, or even eliminating, surface flows in the San Pedro River and adversely affecting the River's riparian habitat.

188.   Groundwater pumping at the Vigneto development could result in drawdown of the aquifer below the San Pedro River near the offsite parcel by 10 meters after 100 years.  The anticipated drawdown could eliminate surface flows at the artesian well on the offsite parcel.  Absent the source of water at the artesian well, the wetland area within the mitigation site would no longer support wetland hydrology and the wetland soils and vegetation would cease to exist at the site over time.

189.   The anticipated drawdown could lower groundwater levels by 33 feet, adversely affecting El Dorado's proposal to plant 400 cottonwood trees.  Climate change would further exacerbate these impacts.  No supplemental watering is proposed for cottonwood plants in the HMMP.

190.   The HMMP also acknowledges that active head cut erosion is an on-going problem contributing to habitat degradation and water quality concerns on the offsite parcel.  The HMMP thus proposes the construction of a rock chute at the head cut and installation of rip rap in the channel immediately downgradient of the new chute to stabilize the advancing head cut.  The HMMP claims these measures would prevent habitat degradation and protect the artesian well/wetland complex from future degradation.

191.   The proposed Vigneto development would, however, increase runoff and erosion, as documented above.  There is no evidence the erosion control measures in the

HMMP would be adequate to protect the offsite parcel given the projected increased runoff and erosion from the development.

192.   The HMMP provides for a 5-year monitoring period once mitigation activities are complete.  This monitoring period does not account for the 20-year buildout of the Vigneto development or the delayed effects of groundwater pumping and surface runoff on surface and subsurface flows.

193.   As discussed above, there is a time lag between groundwater pumping and the point at which pumping effects would reach the San Pedro River, such that the effects of pumping on baseflows may not be fully realized until decades after pumping ceases.  A 5-year monitoring period would not capture these impacts.

194.   By the time the monitoring period ends, El Dorado would have constructed less than one-fourth of the Vigneto development.

## VI.   The Corps Grants a 404 Permit for the Villages at Vigneto.

195.   The Corps granted El Dorado a 404 Permit for 8,212 acres of the Villages at Vigneto development on October 17, 2018.  The Corps did not notify the public of its decision.

196.   The Permit contains a special condition requiring compliance with the HMMP to mitigate the impacts on jurisdictional waters of the United States.

197.   The permittee (El Dorado) must provide notification, either written or verbal, to the Corps at least one week prior to the start of work, as to the anticipated beginning and ending dates of each unit's (Units 1-9) construction in the 8,212-acrea permit area.

198.   Upon information and belief, El Dorado has not yet provided the Corps with any notification of construction activities.

### FIRST CAUSE OF ACTION
### (Violation of NEPA and APA – Inadequate Scope of Analysis)

199.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

200.   NEPA requires federal agencies to analyze and disclose any adverse environmental effects which cannot be avoided should the proposed federal action be implemented.  42 U.S.C. § 4332(C)(ii).

201.   As expressed in the Corps' regulations, the scope of analysis must "address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review."  33 C.F.R. Pt. 325, App. B § 7(b)(1).

202.   The Corps has "control and responsibility" over portions of a project in which "the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action."  *Id*. § 7(b)(2).  The crux of the inquiry is whether jurisdictional "waters must be affected to fulfill the project's goals."  *White Tanks Concerned Citizens, Inc.*, 563 F.3d at 1041.

203.  El Dorado and the Corps have conceded that El Dorado cannot fulfill its goal of developing an interconnected master-planned community on this site without a 404 Permit due to the density and layout of jurisdictional washes.  The jurisdictional washes are dispersed throughout the site in such a way that El Dorado needs to fill the washes at 350 locations spread broadly across the site to develop a cohesive master-planned community.  Accordingly, the Corps has sufficient control and responsibility over the Vigneto development, thereby requiring a comprehensive analysis of the effects of the entire development on the environment.

204.   The Corps 1,919-acre scope of analysis area omits the effects of the Vigneto development by impermissibly focusing on only the proposed fill, a fraction of the development, and the mitigation activities under the Permit.  As a result, the Corps overlooked the impacts of degrading 12,167-acres of upland Sonoran desert habitat and turning this natural habitat into impervious surfaces that would exponentially increase surface runoff and erosion into the San Pedro River.  The Corps also disregarded the significant impacts of pumping 8,427-acres of groundwater per year, which will lower

surface and subsurface flows at St. David Cienega and the San Pedro River, irreversibly damaging the riparian ecosystem and SPRNCA.  The Corps must adopt an appropriate scope of analysis encompassing the entire 12,167-acre proposed Vigneto development, as set forth in the Master Plan.

205.   By artificially narrowing the scope of analysis area, the Corps violated NEPA, 42 U.S.C. § 4321, *et seq.*, its implementing regulations, 40 C.F.R. § 1500, *et seq.*, the Corps' binding NEPA regulations, 33 C.F.R. Pt. 325, App. B, and this Court's precedent.

206.   The Corps' limited scope of analysis was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
### (Violation of NEPA and APA – Impermissible Segmentation)

207.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

208.   NEPA requires agencies to analyze "connected" or "cumulative" actions in a single EIS.  40 C.F.R. § 1508.25(a)(1), (2).  The purpose of this requirement is "to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (quotations omitted).

209.   The Corps violated NEPA by impermissibly segmenting the Villages at Vigneto development into a so-called "Phase I" permit area to avoid a finding of significance under NEPA.  The Master Plan, however, contains no mention of a so-called "Phase I."  In fact, this 8,212-acre permit area does not even align with the approved Master Plan.  Instead, the Corps borrowed this boundary from the prior Whetstone Ranch proposal, which involved a different developer, expired over a decade ago, and does not reflect El Dorado's plan to obtain 404 Permits and develop 12,167 acres of its property into a cohesive, master-planned community.

210.   As a result of this impermissible segmentation, no document analyzes the collective impacts of the proposed Vigneto development on the environment.

211.   Even assuming the Master Plan did carve out a so-called "Phase I," which it did not, the remaining 3,955-acres of the proposed Vigneto development are "connected" actions that must be analyzed in a single EIS.  40 C.F.R. § 1508.25(a)(1). El Dorado planned the Villages at Vigneto as one comprehensive master-planned community.  There is no evidence that the remaining 3,955 acres of the proposed development would be built without the Corps' issuance of the 404 Permit to El Dorado for the 8,212-acre permit area.  The remaining portions of the development lack independent utility, and must be analyzed as part of the Corps' decision to grant this 404 Permit.

212.   The remaining portions of the Vigneto development are also "cumulative" actions that must be analyzed in a single EIS.  40 C.F.R. § 1508.25(a)(2).  The remaining 3,955 acres of the Vigneto development are reasonably certain to occur: El Dorado purchased these lands, developed an integrated plan to develop these lands, and secured financing approval from the City of Benson for the accelerated buildout of these lands.  Developing an additional 3,955 acres, as set forth in the Master Plan, would likely result in significant cumulative impacts to the environment by transforming thousands of acres of upland habitat (including critical habitat for the jaguar) into impervious surfaces and drawing down groundwater levels by an additional 2,395 acre-feet per year.

213.   The Corps' segmentation of the Vigneto development and failure to prepare a comprehensive EIS was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### (Violation of NEPA and APA – Failure to Take a Hard Look at the Direct, Indirect, and Cumulative Impacts)

214.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

215.   NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

216.   To forego preparation of an EIS, an agency must prepare an EA that provides sufficient evidence and analysis to support a FONSI.  40 C.F.R. § 1508.9.  The EA must take a hard look at the direct, indirect, and cumulative impacts of each reasonable alternative to determine if there may be any significant impacts requiring preparation of an EIS.  *Id.* §§ 1502.16(a), (b), 1508.25(c).  Furthermore, the EA must take a hard look at mitigation measures for a proposed action in order to evaluate the severity of the action's adverse effects.  *Id.* §§ 1502.14(f), 1502.16(h), 1508.25(b)(3).

217.   Agencies must consider "both context and intensity" in determining whether an EIS is required.  *Id.* § 1508.27.  Factors relevant to "intensity" include: (1) the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas"; (2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"; (3) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; (4) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts"; (5) "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973"; and (6) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  *Id.* § 1508.27(b)(3)–(5), (7), (9)–(10).  Any one of these factors may be sufficient to require preparation of an EIS.

218.   The Corps relied on a flawed EA to conclude that granting a 404 Permit for the Villages at Vigneto development would not have a significant impact on the environment.  The EA failed to take a hard look at (1) the impacts of the entire Vigneto development, including habitat destruction, increased runoff, and groundwater pumping,

on the unique characteristics of the San Pedro River and SPRNCA, (2) the highly controversial impacts of the development on groundwater drawdown and surface runoff, (3) the significant uncertainty regarding the effectiveness of the proposed mitigation measures, (4) the cumulative impacts of granting a 404 Permit for 8,212 acres of the Vigneto development when combined with the reasonably foreseeable impacts of the entire Vigneto development and climate change on upland habitat, surface hydrology, and riparian habitat; (5) the adverse effects of the Vigneto development on listed species and critical habitat; and (6) whether and to what degree granting a 404 Permit violates the CWA and impairs federally reserved water rights at SPRNCA.

219.   As a result of the flawed EA, the Corps' FONSI and decision to forego preparation of an EIS were arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with NEPA, and therefore should be set aside under the APA.  5 U.S.C. § 706(2)(A).  Due to the significant impacts of granting a 404 Permit, the Corps must prepare an EIS to comply with NEPA.

## FOURTH CAUSE OF ACTION
### (Violation of CWA and APA – Public Interest Determination)

220.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

221.   The Corps' public-interest requirement prohibits issuance of a Section 404 Permit if the "district engineer determines that it would be contrary to the public interest."  33 C.F.R. § 320.4(a).  This far-reaching inquiry requires the Corps to consider "the probable impacts" of the proposed Vigneto development on "[a]ll factors which may be relevant to the proposal," including water supply and conservation, wetlands, fish and wildlife values, and recreation, among other things.

222.   The Corps overlooked the probable impacts of the proposed Vigneto development on the public interest, including impacts on surface and baseflows along the San Pedro River and within SPRNCA; the reduction in groundwater levels throughout the middle San Pedro River basin; the degradation of thousands of acres of ephemeral washes and upland habitat; the adverse impacts on hundreds of species of

wildlife, including listed species and critical habitat; and the potential loss of millions of dollars of revenue from recreational activities, including bird watching.

223.   Consequently, the Corps' conclusion that granting the 404 Permit was not contrary to the public interest, and subsequent issuance of the 404 Permit, was arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the CWA and its implementing regulations.   The decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
### (Violation of CWA and APA –
### Least Environmentally Damaging Practicable Alternative)

224.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

225.   The Corps shall not issue a Section 404 Permit "if there is a [1] practicable alternative to the proposed discharge [2] which would have less adverse impact on the aquatic ecosystem, [3] so long as the alternative does not have other significant adverse environmental consequences."   40 C.F.R. § 230.10(a).

226.   Furthermore, the Corps shall not issue a 404 Permit if "the proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem."   *Id.* § 230.12(a)(3)(iii).   Specifically, the 404(b)(1) Guidelines state that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* §230.10(d).

227.   To ensure an objective analysis, the Corps' NEPA Guidelines admonish the agency to use the same scope of analysis for impacts, alternatives, and benefits.   *See* 33 C.F.R. Part 325, Appendix B § 7(b)(3).

228.   The Corps, however, used two conflicting scopes of analysis to create the impression that granting a 404 Permit for the Vigneto development was the least environmentally damaging practicable alternative, despite the discharge of fill material into 51 acres of jurisdictional waters.   First, the Corps used an 8,212-acre scope of

analysis to eliminate alternatives to the proposed action, including the No Action Alternative, on the grounds that they did not meet the overall project purpose.  Second, the Corps used a narrower 1,919-acre scope of analysis for impacts, creating the false impression that the proposed development had the least impacts on the environment. These conflicting scopes of analysis rendered the Corps' least environmentally damaging practicable alternative (LEDPA) determination arbitrary, capricious, and contrary to law.

229.   Furthermore, the Corps has failed to demonstrate that El Dorado has taken all appropriate and practicable steps to avoid or minimize impacts to jurisdictional washes, including the construction of crossings (both roads and utilities) without any direct impact to any waters of the United States.

230.   Consequently, the Corps' issuance of the 404 Permit was arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the CWA and its implementing regulations.  The decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

**SIXTH CAUSE OF ACTION**
**(Violation of CWA and APA – Failure to Mitigate Impacts)**

231.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

232.   The Corps shall not issue a 404 Permit (1) "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem, and (2) the proposed discharge will not "cause or contribute to significant degradation of the waters of the United States."  40 C.F.R. § 230.10(c), (d).

233.   Mitigation activities follow a three-part sequence: avoidance, minimization, and then compensatory mitigation.  *Id.* § 230.91(c); *see also* 33 C.F.R. § 320.4(r). Compensatory mitigation may not be used as a method to reduce environmental impacts in the evaluation of the least environmentally damaging practicable alternatives.  40 C.F.R. § 230.92 (defining compensatory mitigation to require the "offsetting [of]

unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved").

234.   The Corps "must determine the compensatory mitigation to be required in a DA [404] permit, based on what is practicable and capable of compensating for aquatic resource functions that will be lost as a result of the permitted activity." *Id.* § 230.93(a)(1).  In making this determination, "the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project." *Id.*

235.   Mitigation efforts must be monitored for an adequate period of time to ensure the project meets its performance standards and objectives.  40 C.F.R. § 230.96(b).  Longer monitoring periods are required where the aquatic resources at issue have slow development rates.  *Id.*

236.   The Corps may condition the issuance of a permit on the implementation of compensatory mitigation.  *Id.* § 230.12(a)(2).

237.   The Corps failed to ensure that the HMMP would be ecologically successful and sustainable because it failed to analyze the significant impacts of the full Vigneto development on the mitigation lands and failed to require a sufficient monitoring period to ensure the HMMP meets its purpose and goals.

238.   Additionally, the Corps improperly double counted the mitigation activities provided in the HMMP as both the LEDPA and compensatory mitigation, in violation of the CWA and the 404(b)(1) Guidelines.

239.   Consequently, the Corps' decision to issue the 404 Permit was arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the CWA and its implementing regulations.  The decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that the Corps violated NEPA by granting a 404 Permit for the Villages at Vigneto development without preparing an adequate NEPA analysis;

2.     Declare that the Corps violated the CWA by granting a 404 Permit without objectively analyzing whether granting a permit was the least environmentally damaging practicable alternative and without adequately mitigating the impacts of the 404 Permit or ensuring that granting a 404 Permit is in the public interest.

3.     Set aside and vacate Corps' decision granting a 404 Permit for the Villages at Vigneto development;

4.     Issue an injunction ordering Defendants to not approve or otherwise take action pursuant to any Section 404 Permit for the Villages at Vigneto development, unless and until Defendants comply with NEPA, the CWA, and their implementing regulations;

5.     Order the Corps to prepare an Environmental Impact Statement analyzing the significant impacts of the proposed project;

6.     Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

7.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorney's fees, associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and/or all other applicable authorities; and

8.     Grant Plaintiffs such additional relief as the Court deems just and proper.

DATED this 31st day of January, 2019,


                        */s/ Stuart Gillespie*
                        Stuart C. Gillespie (CO Bar No. 42861)
                            *(pro hac vice pending)*
                        Caitlin Miller (CO Bar No. 50600)
                            *(pro hac vice pending*)
                        Earthjustice
                        633 17th Street, Suite 1600
                        Denver, CO 80202

sgillespie@earthjustice.org
Phone: (303) 996-9616
Fax: (303) 623-8083

*Attorneys for Plaintiffs Lower San Pedro Watershed Alliance;
Center for Biological Diversity; Sierra Club; Maricopa Audubon
Society; Tucson Audubon Society; and Cascabel Conservation
Association*